THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SAMUEL SMITH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 06 C 6814 |
| v. | ) |
| | ) |
| MICHAEL J. ASTRUE | ) Magistrate Judge |
| Commissioner of | ) Arlander Keys |
| Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Samuel Smith, moves this Court for Summary
Judgment, pursuant to Rule 56(a) of the Federal Rules of Civil
Procedure, to reverse the final decision of the Commissioner of
Social Security (the "Commissioner"), which denied his claim for
Disability Insurance Benefits ("DIB"). *See* 42 U.S.C. § 405(g).
In the alternative, Plaintiff seeks an order remanding the case
to the Commissioner for further inquiry and evidence. Defendant,
Commissioner, has filed a Cross-Motion for Summary Judgment,
asking this Court to affirm the Commissioner's final decision.
For the reasons set forth below, Plaintiff's Motion for Summary
Judgment is granted in part, and the Commissioner's Motion for
Summary Judgment is denied.

1

## PROCEDURAL HISTORY

On May 14, 2004, Plaintiff filed an application for DIB, claiming disability since July 30, 2003 due to a heart attack and stroke. (R. at 30.) The Social Security Administration (the "SSA") denied Plaintiff's claim on October 20, 2004. (R. at 32.) Plaintiff filed a Request for Reconsideration on November 3, 2004, which the SSA ultimately denied on February 8, 2005. (R. at 41-42).

On March 7, 2005, Plaintiff filed a timely request for a hearing before an Administrative Law Judge (the "ALJ"). (R. at 46.) The SSA granted Plaintiff's request, and ALJ John Kraybill held a hearing on July 13, 2006. (R. at 48, 149.) Following the hearing, the ALJ issued an unfavorable decision, finding Plaintiff not disabled at any time from July 30, 2003 through the date of the decision, August 4, 2006. (R. at 15-20.) Plaintiff then filed a request for review of the ALJ's decision with the Social Security Administration's Appeals Council (the "Appeals Council"). (R. at 10.) The Appeals Council denied the request on October 16, 2006; therefore, the ALJ's decision stands as the Commissioner's final decision. (R. at 4-6.) As a result, Plaintiff commenced this action seeking reversal of the

Commissioner's final decision, or in the alternative, remand for further proceedings.

## STATEMENT OF FACTS

### A. Evidence Presented at Plaintiff's Hearing

### 1. Plaintiff's Testimony

Samuel Smith was born on September 6, 1952 and was 54 years old at the time of the ALJ's decision. He stands approximately 5 feet 11 inches tall and weighs approximately 190 pounds. Pl.'s Mot. at 3. He is divorced and has no minor children. At the hearing, he testified that he is a high school graduate and has lived at the same address for twenty years. (R. at 91, 163.) In the past, Plaintiff smoked cigarettes, but he asserted that he had not smoked for approximately three months prior to his hearing. (R. at 155.) For approximately seventeen years, Plaintiff worked as a roofer, but currently, he is not working, and he stated that he thought that the last time he worked was three years prior to the hearing. (R. at 155, 160.)

Plaintiff testified that in 1996 he suffered a heart attack and stroke.[1] (R. at 92, 162.) He claims that his heart attack and stroke have caused him various problems, and these problems are the basis for his DIB claim. *Id.* After suffering a heart

---
[1] Plaintiff's medical records state that he had a heart attack in 1996 and a stroke in 1997. (R. at 108.) Nonetheless, this discrepancy has no bearing on any issue before this Court and will not affect the outcome of this case.

3

attack and stroke, Plaintiff continued working as a roofer. (R. at 161.) He stated, however, that he stopped working in 2003 because his "doctor detected something inside of [his] body," and as a result, his doctor had to implant a defibrillator in him. (R. at 155, 161.)

On June 21, 2004, Plaintiff completed a questionnaire regarding his medical condition in which he stated that he could not keep his arm above his right shoulder for very long. (R. at 79-81.) He also stated that, when he would get up from a chair or sofa or out of bed, he would get dizzy at times. (R. at 80.) Plaintiff additionally stated that he was able to sit for two hours, and he could shop or prepare a meal without needing time out to sit. (R. at 80.) On the other hand, he stated that he did not perform chores such as cleaning, making beds, or doing laundry, nor did he do any yard work or household repairs. (R. at 81.) Additionally, he stated that he was unable to play sports or use exercise equipment, and he felt that he could no longer work. Id.

At the hearing, Plaintiff testified that his medical problems were affecting his daily life. Plaintiff explained that he no longer goes grocery shopping nor does he do any cooking or cleaning. (R. at 157.) He stopped driving two and a half years

4

prior to his hearing because he was afraid to drive, and he occupies most of his time "sitting around, bored" and "try[ing] to watch television." (R. at 157, 165.)

Although Plaintiff claimed that he does have chest pains, he stated that the main symptom from his heart attack and stroke is tiredness. (R. at 159.) He complains that he tires after walking about one half of a block. (R. at 159.) Yet, according to Plaintiff, his doctor told him that he needed to exercise, and therefore, twice a week, Plaintiff rides his bike to the end of his block and back home again approximately four times. (R. at 159-60.) He stated that after he rides his bike, he feels tired and needs to sit and take a nap. (R. at 161.) Plaintiff also testified that he takes Coumadin, and therefore, he is not supposed to do strenuous biking or exercise. (R. at 160.)

In addition to Plaintiff's heart attack and stroke-related problems, he also claimed that he has problems relating to back pain, knee pain, and shoulder pain. According to Plaintiff, his back hurts at times, and he gets uncomfortable from lying around and from resting. (R. at 164-65.) Yet, he has not sought any treatment for his back pain because he thought the problem would go away. *Id.* He stated that he can only stand in one spot for about five minutes because his knees hurt. (R. at 163.)

Plaintiff testified that he had knee surgery in 1995, in which the doctor removed "a lot of cartilage" from one of his knees. (R. at 163.) Additionally, Plaintiff also testified that, in 2003, he fell off of a roof and injured his shoulder, and he still occasionally has problems moving his shoulder. (R. at 157-58.) Plaintiff stated that he went to the emergency room when he injured his shoulder, but otherwise, the only doctor that he has seen since he had his heart attack and stroke is Dr. Goodwin, a heart specialist. (R. at 162.)

At the hearing, Plaintiff explained that, in 2003, Dr. Goodwin recommended that he have a defibrillator implanted in his heart, and Plaintiff complied with this recommendation about a year before his hearing. (R. at 155.) Plaintiff stated that he has not had any problems with the defibrillator since it was implanted, and every three months he gets it checked. (R. at 156, 164.) He testified that he does not see the doctor each time he gets his defibrillator checked, but he sees the doctor's assistant. (R. at 165.) At the time of Plaintiff's hearing, he had been taking Coumadin for eleven years, and according to Plaintiff, his blood levels are checked once a month at Mercy Center Hospital in Aurora, IL. (R. at 156, 164-65).

6

## 2. Vocational Expert's Testimony

Ms. Glee Ann Kehr, a vocational expert (the "VE"), testified at Plaintiff's hearing. At the hearing, the ALJ described to Ms. Kehr a hypothetical person with the same work history and of the same age and with the same education as Plaintiff. (R. at 167.) The hypothetical assumed that the person had a residual functional capacity ("RFC") to perform light work. (R. at 167.) The ALJ asked the VE further to assume that the hypothetical person would have the additional limitations of avoiding heights, climbing, and operating dangerous machinery. *Id.* In the ALJ's hypothetical, the person also would not be able to engage in extensive crouching or crawling. *Id.*

Ms. Kehr testified that the hypothetical person could not perform Plaintiff's past work, but that the person could perform jobs at the light level. (R. at 168.) Ms. Kehr gave three examples of jobs that would fit the person's limitations. *Id.* First, he could perform work as a cashier, of which there are approximately 6,000 positions available in the Chicago Metropolitan area. (R. at 168.) Second, he could perform work as a mail clerk, of which there are also approximately 6,000 positions available in the Chicago Metropolitan area. *Id.* Finally, he could perform work as an office helper, of which

7

there are approximately 4,000 positions available in the Chicago
Metropolitan area. *Id.* Ms. Kehr also noted that her testimony
was consistent with the *Dictionary of Occupational Titles.* *Id.*

Plaintiff's attorney pointed to medical evidence that
indicated that no extensive stooping would also be a limitation
on Plaintiff. (R. at 168.) Accordingly, Plaintiff's attorney
asked the VE to include the limitation of no extensive stooping
to the description of the hypothetical person. *Id.* The VE's
opinion was that most of the jobs available to the hypothetical
person would involve only occasional stooping, and therefore, the
numbers of the jobs cited would not be impacted by the added
limitation of no extensive stooping. *Id.*

### 3. Medical Expert's Testimony

Dr. John Cavenaugh, a Board Certified internist, testified as
a medical expert (the "ME") at Plaintiff's hearing. (R. at 151.)
Dr. Cavenaugh described Plaintiff as having a history of
myocardial infarction (heart attack in 1996) followed by ischemic
cardiomyopathy, with some cardiac enlargement and decrease in his
left ventricular function. (R. at 152.) Because of Plaintiff's
ischemic myopathy and the history of episodes of tachycardia, Dr.
Cavenaugh stated that an implantable cardioverter defibrillator
("ICD") was implanted in Plaintiff's heart to protect him against

8

serious ventricular tachycardia or ventricular fibrillation. *Id.*

Dr. Cavenaugh further testified to the following:

> [Plaintiff's] functional capacity has been better than one reported ejection fraction of 25 percent. That does not seem consistent with his history of good exercise tolerance and riding a bike three times a week. And his physical findings reveal no evidence of congestive failure. The lungs were clear and there were no gallops. So I would say, Your Honor, that the medical evidence reveals status-post – chronic coronary heart disease status-post myocardial infarction in '96 with ischemic cardiomyopathy since then resulting in bouts of tachycardia for which he had an ICD implanted successfully.

*Id.* Dr. Cavenaugh then opined that Plaintiff did not meet or equal a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1. *Id.*

Although Dr. Cavenaugh did not opine that Plaintiff met or equaled a Listing, Dr. Cavenaugh did recommend that Plaintiff be limited to a light level of activity. (R. at 153.) In addition, Dr. Cavenaugh stated that, because Plaintiff takes Coumadin, he should limit himself by avoiding the following: heights; dangerous machinery; and climbing. Dr. Cavenaugh also stated that stooping and crouching would probably be difficult for Plaintiff, and he recommended that Plaintiff not engage in that sort of activity. (R. at 153-54.) On the other hand, Dr. Cavenaugh testified that Plaintiff's ICD should not pose any

9

problems to Plaintiff with respect to normal range of motion of
his upper extremities.  (R. at 154.)

## 4.  Medical Evidence

In addition to Dr. Cavenaugh's testimony at Plaintiff's
hearing, Plaintiff submitted medical records to the ALJ detailing
his treatment since his injury.  The Court will discuss these
records below.

### State Agency Physician

On September 22, 2004, a state agency physician, Kim Young-Ja,
M.D., completed an assessment of Plaintiff's physical abilities.
(R. at 109-16.)  When Dr. Young-Ja evaluated Plaintiff's
abilities, she considered Plaintiff's history of cerebral
embolism with cerebral infarction, myocardial infarction, and
shoulder injury.  (R. at 109-10.)  Dr. Young-Ja's report
indicated that Plaintiff could occasionally lift or carry twenty
pounds, frequently lift or carry ten pounds, and stand or walk
(with normal breaks) for a total of about six hours in an eight-
hour workday.  (R. at 110.)  The report also indicated that
Plaintiff had no established postural limitations, including
stooping, crouching, and crawling, and no manipulative
limitations, including reaching and handling.  (R. at 111-12.)
Dr. Young-Ja noted that Plaintiff had audible and understandable

speech, normal gait, and intact fine motor skills. (R. at 116.)
She also noted that Plaintiff's neurological systems, and cardiac
system were within normal limits. *Id.* On January 24, 2005,
Maldala Vidya, M.D., another state agency physician, affirmed Dr.
Young-Ja's assessment. (R. at 117.)

## Midwest Heart Specialists

Mark Goodwin, M.D., a physician at Midwest Heart Specialists,
saw Plaintiff on June, 11 2004. Dr. Goodwin's report indicated
that, in 1996, Plaintiff had a myocardial infarction (heart
attack) with moderate left ventricular dysfunction and small
apical aneurysm and that, in 1997, he had a cerebrovascular
accident (stroke), presumed embolic.[2] (R. at 108.) The report
also stated that Plaintiff was taking Coumadin and that he should
continue taking it. (R. at 108-09.) In addition, the report
indicated that Plaintiff smoked one pack of cigarettes per day
and that Dr. Goodwin advised him to quit smoking. (R. at 107.)

---

[2] In the Record, there are two letters written by Dr. Goodwin. Dr. Goodwin addressed the first letter, dated January 10, 1997, to the Roofer's Unions Welfare Trust Fund. In this letter, Dr. Goodwin stated:

[Plaintiff] was seen by me in the office today. He . . . had a CVA and a myocardial infarction in the past year . . . . He has been 100% disabled since the time of his heart attack and stroke . . . . At this point, he is *unable to return to work and remains fully disabled.*

(R. at 129) (emphasis added). Dr. Goodwin addressed the second letter, dated January 13, 1997, to Michael I. Rosenberg, M.D., another treating physician. In this letter, Dr. Goodwin stated:

Recently I saw [Plaintiff] in the office. I have been following him since his myocardial infarction. He has shown amazing recovery since the time of his stroke. He is doing very well post myocardial infarction and CVA . . . . If he continues to do well, *I would feel comfortable with him returning to work as a roofer.*

(R. at 128) (emphasis added). Plaintiff's attorney mentions the first letter in his brief, but he fails to mention the second letter. Without additional information to explain the apparent contradiction, this Court cannot rely on either letter. Nonetheless, this will not affect the outcome of this case.

According to Dr. Goodwin, Plaintiff's hypertension was under "good control," but he also noted that if Plaintiff's ejection fraction continued to decrease, then he may need to consider a defibrillator. *Id.*

On August 5, 2005, Dr. Goodwin again saw Plaintiff. (R. at 126.) Dr. Goodwin indicated that Plaintiff had recently had an ejection fraction of twenty-five percent and that Plaintiff was scheduled for an ICD evaluation with Moeen Saleem, M.D., Dr. Goodwin's partner. *Id.* Additionally, Dr. Goodwin acknowledged that Plaintiff quit smoking two weeks prior to August 5, 2005. *Id.*

As Dr. Goodwin expected, Dr. Saleem saw Plaintiff for an ICD evaluation on August 10, 2005. (R. at 124-25.) Dr. Saleem stated that Plaintiff's most recent ejection fraction was around twenty-five percent with regional wall abnormalities. (R. at 124.) He noted that Plaintiff had no history of palpitations or syncope, had no chest pain, and had a "quite good" exercise tolerance. *Id.* Dr. Saleem stated that Plaintiff was certainly at risk for sudden cardiac death, and because of his ejection fraction, he was an excellent candidate for an ICD. *Id.*

Plaintiff returned to Dr. Saleem on August 23, 2005, and at that time, Dr. Saleem implanted a St. Jude single lead ICD in

Plaintiff. (R. at 118-19.) Dr. Saleem stated that Plaintiff underwent the ICD implantation without problems. (R. at 118.) According to the Discharge Summary, dated the day after Plaintiff's implantation surgery, Plaintiff's left chest pocket was without hematoma, his chest X-ray was without pneumothorax, and his lead status was within normal range. *Id.* Dr. Saleem also noted that Plaintiff's total cholesterol was 327, with an LDL of 251, and that Plaintiff had not been taking his Lipitor because of financial reasons. *Id.*

After Plaintiff's implantation surgery, Plaintiff had a follow-up examination on March 24, 2006. (R. at 122.) According to the treatment notes from that examination, he was "doing well" and "had no chest pains and no palpitations." *Id.* The notes also indicated that Plaintiff rated as a "functional class 1,[1]" and he had satisfactory ICD function. *Id.* Plaintiff had a second follow-up examination on April 21, 2006, and the report from this examination showed that an echocardiogram indicated that Plaintiff's overall left ventricular ejection fraction was approximately forty percent. (R. at 131.) In addition, a Doppler evaluation showed mildly elevated right heart pressures and mild mitral regurgitation. *Id.* A report from Plaintiff's

[1] "Class 1. Patients with cardiac disease but without resulting limitation of physical activity. Ordinary physical activity does not cause undue fatigue, palpitation, dyspnea, or anginal pain." American Heart Association, *at* http://www.americanheart.org/presenter.jhtml?identifier=1712 (February 27, 2008).

13

next follow-up evaluation, on June 23, 2006, again indicated that Plaintiff was "doing well" and had "no chest pains and no palpitations." (R. at 121.) Furthermore, the report again stated that Plaintiff rated as a "functional class 1," and Plaintiff had satisfactory ICD function. *Id.*

## B. The ALJ's Decision

On August 4, 2006, the ALJ issued his decision, finding that Plaintiff was not disabled. (R. at 15-20.) He declared that he reviewed all of the evidence of record in making his decision. *Id.* According to the ALJ, he evaluated Plaintiff's personal and work history, as well as the VE's testimony. (R. at 17-20.) He stated that he also considered all medical opinions in the record regarding the severity of Plaintiff's impairment. *Id.*

The ALJ noted that Plaintiff, 50 years old on the alleged disability onset date, was approaching advanced age and that he had a high school education. (R. at 19.) He found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2008. (R. at 17.) He also found that Plaintiff had not engaged in substantial gainful activity since July 30, 2003, the alleged onset date of his disability. *Id.*

The ALJ found that claimant had the severe impairments of ischemic heart disease and cerebrovascular accident, but that his impairments, nonetheless, did not meet or medically equal one of the listed impairments in 20 CRF Part P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526). *Id.*

The ALJ concluded that Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms. (R. at 18.) Nevertheless, the ALJ found that Plaintiff's statements about the intensity, persistence, and limiting effects of his symptoms were not entirely credible nor did the medical evidence fully support his complaints. *Id.*

In determining Plaintiff's RFC, the ALJ concluded that Plaintiff could do slightly reduced light work. (R. at 18.) He found that Plaintiff could lift and/or carry twenty pounds occasionally, ten pounds frequently, stand and/or walk at least six hours in an eight-hour workday, and sit for at least six hours in an eight-hour workday. *Id.* He also found, however, that Plaintiff would need to avoid the following: heights; dangerous machinery; and climbing. *Id.* Furthermore, the ALJ found that Plaintiff should avoid extensive crouching, crawling, and stooping. *Id.* With this RFC, the ALJ found that Plaintiff was unable to perform any past relevant work and that he had no

15

transferable skills. (R. at 19.) On the other hand, the ALJ concluded that Plaintiff's RFC would enable him to perform a full range of light work, and he relied on the VE's testimony to determine whether a significant number of jobs existed in the national economy that Plaintiff could perform. (R. at 20.) Accordingly, the ALJ concluded that Plaintiff could qualify for approximately 6,000 cashier jobs, 6,000 mail clerk jobs, and 4,000 office helper jobs. *Id.*

As a result of the above listed findings, the ALJ determined that Plaintiff was not disabled, as defined in the Social Security Act, at any time from July 30, 2003 through the date of the ALJ's decision. (R. at 20.)

## STANDARD OF REVIEW

In reviewing the ALJ's decision, the Court may not decide facts, reweigh the evidence, or substitute its own judgment for that of the ALJ. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990); *see also Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989) (the ALJ has the

16

authority to assess medical evidence and give greater weight to that which he finds more credible).

While reviewing an ALJ's decision, the Court is limited to determining whether the Commissioner's final decision is supported by substantial evidence and is free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Herron*, 19 F.3d at 333. In reviewing an ALJ's decision for substantial evidence, the Court may not "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). This does not mean, however, that the ALJ is entitled to unlimited judicial deference. The ALJ must consider all relevant evidence and may not select and discuss only that evidence that favors his ultimate conclusion. *Herron*, 19 F.3d at 333. In addition to relying on substantial evidence, the ALJ must articulate his analysis by building an accurate and logical bridge from the evidence to his conclusions so that the Court may afford the claimant meaningful review of the SSA's ultimate findings. *Steele*, 290 F.3d at 941. Lastly, although Plaintiff

bears the burden of demonstrating his disability, "[i]t is a basic obligation of the ALJ to develop a full and fair record." *Thompson v. Sullivan,* 933 F.2d 581, 585 (7th Cir. 1991) (quoting *Smith v. Sec'y of HEW,* 587 F.2d 857, 860 (7th Cir. 1978)). It is not enough that the record contains evidence to support the ALJ's decision. *Steele,* 290 F.3d at 941. Rather, the ALJ must rationally articulate the grounds for that decision. *Id.*

## SOCIAL SECURITY REGULATIONS

An individual claiming a need for DIB must prove that he or she has a disability under the terms of the SSA. The Social Security Regulations prescribe a sequential five-part test to determine whether an individual is disabled. *See* 20 C.F.R. §§404.1520 and 416.920 (2001). The ALJ must determine: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether such impairment or combination of impairments meets or equals any impairment, listed by the Commissioner in 20 C.F.R. Part 404, Subpart P, Appendix 1, as being so severe to preclude gainful activity; (4) whether the claimant is unable to perform his or her past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy. *See* 20 C.F.R. §§ 404.1520 and 416.920;

*see also Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995). A finding of disability requires an affirmative answer either at step three or step five. A negative answer at any step (other than step three) precludes a finding of disability. *Id.* At steps one through four, the claimant bears the burden of proof, but at step five, the burden shifts to the Commissioner. *Id.*

## DISCUSSION

Plaintiff contends that the ALJ erred in concluding that he is not disabled. Plaintiff argues that the ALJ's decision should be reversed or remanded because the ALJ failed to refer to a specific Listing and because he failed to adequately analyze the medical evidence, on which the ALJ based his conclusion that Plaintiff had not met the criteria of any Listing. Plaintiff also contends that the ALJ failed to properly evaluate his credibility and that the ALJ failed to adequately analyze whether, and to what extent, any of Plaintiff's symptoms would affect his ability to work. For the reasons discussed below, the Court remands this matter for further proceedings.

## A. The ALJ's Step Three Determination

Plaintiff first alleges that, because the ALJ failed to refer to a specific Listing, the ALJ's decision does not connect the evidence with his conclusion that Plaintiff does not meet or

equal a Listing. Defendant, on the other hand, argues that the
ALJ's decision was supported by substantial evidence.

A plaintiff is eligible for DIB if he or she has an
impairment that meets or equals a Listing. 20 C.F.R.
§404.1520(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1. If an ALJ
does not discuss a *specific* Listing when determining whether a
plaintiff meets or equals a Listing, then the ALJ has not
adequately articulated the basis for his or her conclusion.
*Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003); *Scott v.
Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). The Seventh Circuit
has not hesitated to remand an ALJ's decision that does not
sufficiently articulate the basis for the denial of benefits. *See
Brindisi*, 315 F.3d at 784; *see also Scott*, 297 F.3d at 595.

In the present case, the ALJ did not analyze Plaintiff's
impairments with respect to a specific Listing. When the ALJ
made his determination that Plaintiff did not meet or equal a
Listing, he merely stated that "[t]he ME testified, in relevant
part, that he had an opportunity to review the medical evidence
which showed no listing [was] met or equaled." (R. at 17.)
Then, the ALJ summarily concluded, "I agree with the ME's
opinions regarding the nature and severity of the claimant's
impairments that do not equal a listing ...." (R. at 18.)

While the ALJ agreed that Plaintiff had severe impairments, he conducted no further analysis as to why Plaintiff did not meet or equal a Listing. Such a conclusion, standing alone, does not sufficiently articulate the ALJ's assessment of the evidence as the courts in this jurisdiction require. *See Brindisi*, 315 F.3d at 784 (Because the ALJ's opinion did not mention the specific Listings under which it considered the plaintiff's impairments, the Court held that the ALJ's "conclusion [was] devoid of any analysis that would enable meaningful judicial review."); *Scott*, 297 F.3d at 595 (The Court remanded the case because the ALJ did not discuss or even reference a specific Listing, noting that Courts within this jurisdiction "have repeatedly admonished ALJs to 'sufficiently articulate [their] assessment of the evidence to assure us that [they] considered the important evidence and ... to enable us to trace the path of [their] reasoning.'" (quoting *Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999)). The ALJ in this case did not adequately "build an accurate and logical bridge from the evidence to [the] conclusion" so that this Court may assess the validity of his decision and afford Plaintiff meaningful review.

Additionally, Plaintiff contends that, when the ALJ determined that Plaintiff did not meet or equal a Listing, he erroneously

relied upon the ME's testimony to support his determination, and the ALJ did not provide his own analysis of the evidence. Conversely, even though Defendant admits that the ALJ "largely relied on the testimony of Dr. Cavenaugh" in his determination of whether Plaintiff met or equaled a Listing, Defendant argues that the record provides adequate evidence to support the ALJ's decision that Plaintiff did not satisfy the criteria of any Listing.

Even if, as Defendant argues, the record and the testimony of the ME provide adequate evidence to support the ALJ's decision, the ALJ must rationally articulate his or her decision *regardless* of whether there is evidence in the record to support that decision. *See Steele*, 290 F.3d at 941 (7th Cir. 2002) ("Regardless whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for her decision and confine our review to the reasons supplied by the ALJ."); *see also Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an

accurate and logical bridge between the evidence and the result.") In the instant case, the ALJ did not do this. He failed to rationally articulate his decision regardless of whether there was evidence in the record to support his decision. When the ALJ made his determination that Plaintiff did not meet or equal a Listing, the only evidence that he stated he considered was the ME's testimony. Because the ALJ's Listing conclusion is not supported by adequate analysis, this Court is unable to determine what, in fact, was the ALJ's reasoning, or whether his reasoning was sound when he determined that Plaintiff did not meet or equal a Listing.

This Court recognizes that valid reasons may well exist to doubt whether Plaintiff's impairments meet or equal a Listing (e.g., his doctor rating him as a "functional class I," or his ejection fracture possibly equaling forty percent). Nonetheless, the ALJ, and not this Court, is charged with the duty of pointing to *specific* medical evidence that Plaintiff's impairments do not meet or equal a Listing. The ALJ failed to do this, and the Court must, therefore, remand this case for further proceedings to determine whether Plaintiff met or equaled a Listing.

## B. The ALJ's Credibility Determinations

Plaintiff next contends that the ALJ improperly evaluated Plaintiff's credibility, and that the ALJ ignored Plaintiff's testimony regarding his debilitating fatigue that resulted from his heart attack and stroke and his confusion that resulted from his Coumadin regimen. Conversely, Defendant argues that the ALJ properly evaluated Plaintiff's credibility and sufficiently considered Plaintiff's testimony.

"The Seventh Circuit has ruled that a claimant must provide credible testimony *and* objective medical evidence to qualify for disability insurance benefits for allegations of pain." *Cichon v. Barnhart*, 222 F.Supp.2d 1019, 1026 (7th Cir. 2002) (quoting *Moothart v. Bowen*, 934 F.2d 114, 117 (7th Cir. 1991). Accordingly, credibility determinations are one step in a two-step process that is prescribed by the regulations for evaluating a claimant's request for disability benefits based on pain. *Aidinovski v. Apfel*, 27 F.Supp.2d 1097, 1103 (7th Cir. 1998) (citing 20 C.F.R. § 404.1529(b), (c); SSR 96-7p). At the first step, the ALJ must determine whether the alleged pain is supported by objective medical evidence that could reasonably produce such pain, and at the second step, the ALJ must evaluate the credibility of the claimant's subjective statements as to the

intensity, persistence, and functionally limiting effects of such pain. *Cichon*, 222 F.Supp.2d 1019, 1026 (7th Cir. 2002). "The ALJ's credibility determinations generally will not be overturned unless they are 'patently wrong.'" *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). Although deference to the ALJ's determination is usually warranted because the ALJ is in the best position to judge the claimant's credibility, "absolute deference, however, is not in order, for the ALJ must still provide an 'accurate and logical bridge between the evidence and the result'." *Aidinovski v. Apfel*, 27 F.Supp.2d 1097, 1102 (7th Cir. 1998) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)). When an ALJ evaluates the credibility of statements supporting a Social Security application, he or she should comply with the requirements of Social Security Ruling 96-7p. *Steele*, 290 F.3d at 942. Social Security Ruling 96-7p prohibits ALJs from making conclusory credibility determinations, and instead, requires the ALJ to articulate the reasons behind his or her credibility evaluations.[4] *Steele*, 290 F.3d at 942 (The ALJ erred because her

---

[4] Social Security Ruling 96-7 states in pertinent part:

> [t]he finding on the credibility of the individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility. The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible' . . . . The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the

25

"evaluation of [plaintiff's] credibility [did] no more than cite ruling 96-7p without supplying any of the details demanded by that provision."); *Brindisi ex. Rel. Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003); Social Security Ruling 96-7p (1996). If the ALJ's credibility decision is "so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele*, 290 F.3d at 940.

In the present case, the ALJ "found that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms." (R. at 18.) Nonetheless, he concluded that "the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms [were] not entirely credible." (R. at 18.) When the ALJ made his determination, he first considered objective medical evidence. The ALJ stated:

> The medical evidence of record, according to the ME was somewhat confusing since the claimant had a listing level ejection fraction of 25% prior to the ICD implant and subsequent ejection fraction of 40%. The ME opined that 40% was more consistent with the records. The claimant was also listed as a Class I. Although the claimant alleges disabling fatigue, the ME says he has a slightly reduced residual functional capacity. I agree.

---

adjudicator gave to the individual's statements and the reasons for that weight. This documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well- reasoned determination or decision.
(S.S.A. July 2, 1996).

26

(R. at 18.)  When the ME testified, however, he never stated that Plaintiff's ejection fraction was forty percent; instead, he merely stated that "[Plaintiff's] functional capacity has *been better* than one reported ejection fraction of *25 percent.*"  (R. at 152) (emphasis added).  Although Plaintiff and Defendant do not dispute that the ME never testified that Plaintiff's ejection fraction equaled forty percent, they do dispute whether Plaintiff's ejection fraction was ever forty percent.  Plaintiff had an examination on April 21, 2006, and the report from this examination showed that an echocardiogram indicated that Plaintiff's overall left ventricular ejection fraction was approximately forty percent.  (R. at 131.)

Although the Court cannot be certain that the ALJ reviewed the April 21, 2006 report because he failed to reference it in his decision, the Court does find his conclusion is supported by substantial evidence.  When an ALJ's decision, which is based on "matters of fact, is unreliable because of serious mistakes or omissions, the reviewing court must reverse unless satisfied that no reasonable trier of fact could have come to a different conclusion, in which event a remand would be pointless." *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996) (citing *O'Connor v. Sullivan*, 938 F.2d 70, 73-74 (7th Cir. 1991); *Green v. Shalala,*

51 F.3d 96, 100-01 (7th Cir. 1995)). In *Sarchet*, the Court
remanded the ALJ's decision in part because "[t]he administrative
law judge's opinion [contained] a substantial number of illogical
or erroneous statements that [bore] materially on her conclusion
that [the plaintiff was] not totally disabled." *Id.* at 307. In
this case, however, the Court is not convinced that the ALJ's
misstatement of the ME's testimony was tantamount to the
"substantial number of illogical or erroneous statements" made in
*Sarchet*, especially because the ME did say that Plaintiff's
ejection fraction was more than twenty-five percent, and only
failed to specify the exact amount. Moreover, the document
evidencing Plaintiff's ejection fraction at forty percent was
dated less than three months before the hearing, as opposed to
the finding of twenty-five percent, which was dated almost one
year prior to the hearing. Therefore, this case is
distinguishable from *Sarchet*, and this single misstatement, on
its own, does not warrant remand.

In addition to correctly relying on objective medical
evidence, the ALJ must also evaluate the credibility of
Plaintiff's allegations regarding the intensity and persistence
of his pain. *Aidinovski*, 27 F.Supp.2d at 1103. As previously
stated, when an ALJ makes allegations concerning the intensity

and persistence of a plaintiff's pain, he or she should take into account the several factors listed at 20 CFR § 404.1529(c) and Social Security Regulation 96-7p, which include: prior work record; daily activities; location, duration, frequency and intensity of pain; precipitating and aggravating factors; use of medication; other treatments and measures used to relieve pain; observation of testimonial evidence by the claimant; and the consistency of the claimant's statements. *Id.*

In the instant case, the ALJ listed several of Plaintiff's complaints. He stated that Plaintiff quit smoking three months before his trial, despite Plaintiff's allegations of disabling fatigue due to heart problems and his ICD. (R. at 18.) The ALJ also noted that Plaintiff claimed the following: he could not stand for five minutes, but says he can bike for short distances; his back hurt, yet he received no treatment; he has been confused since being on Coumadin; heat/tar bothered him; he has not driven for two and half years prior to his trial; and he is non-compliant with his Lipitor because of financial reasons. (R. at 18-19.) The ALJ also stated that the Social Security Ruling 96-7 factors did not support Plaintiff's complaints. (R. at 18.)

"Under Social Security Ruling 96-7p, the ALJ's determination or decision regarding claimant credibility 'must contain *specific*

29

*reasons* for the finding on credibility, supported by the evidence
in the case record, and must be *sufficiently specific* to make
clear to the individual and to any subsequent reviewers the
weight the adjudicator gave to the individual's statements and
the *reasons for that weight.'"* *Zurawski*, 245 F.3d at 887
(emphasis added). Thus, it is not sufficient for the ALJ to make
a blanket statement that "[the] 96-7 factors do not support the
claimant's complaints" without the ALJ providing specific reasons
as to how these complaints were considered, or as to why these
complaints were (or were not) credible. *See Zurawski*, 245 F.3d
at 887.

Here, the ALJ did not make a blanket statement regarding
Plaintiff's complaints. Instead, the ALJ provided specific
reasons for his credibility determination (e.g., Plaintiff could
not stand for five minutes, but says he can bike for short
distances, Plaintiff's back hurt, yet he received no treatment).
In other words, the ALJ found Plaintiff's testimony regarding the
intensity and persistence of the pain not credible considering,
what the ALJ found to be, contradictory testimony by Plaintiff.
Thus, this Court is satisfied that the ALJ adequately evaluated
the credibility of Plaintiff's allegations regarding the

intensity and persistence of his pain. Hence, the Court does not find remand appropriate on this basis.

## C. Plaintiff's Residual Functional Capacity

Plaintiff also contends that the ALJ's assessment of Plaintiff's RFC determination was erroneous. Specifically, Plaintiff argues that, while the ALJ stated that he gave considerable weight to the opinion of the ME, who offered a slightly reduced RFC, when the ALJ made the RFC determination, he offered no reference to the record, nor conducted any analysis to support the ME's opinion. In addition, Plaintiff argues that the ALJ failed to consider Plaintiff's claim of debilitating fatigue resulting from his heart attack and stroke, as well as Plaintiff's claim that his Coumadin regimen causes him to be confused. Conversely, Defendant argues that the ALJ's finding, that Plaintiff did not suffer debilitating fatigue or confusion, was reasonable, and therefore, the ALJ's RFC assessment was proper.

"'Residual functional capacity' is that which a claimant can still do despite her physical and mental limitations." *Clifford v. Apfel*, 227 F.3d 863, 873 n.7 (7th Cir. 2000) (citing *Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999)); 20 C.F.R. § 404.1545(a). When an ALJ makes a RFC determination, the ALJ

should consider the claimant's ability to lift weight, sit-stand, walk, and push-pull. *Clifford*, 227 F.3d at 873 n.7 (citing 20 C.F.R. § 404.1545(b)). The ALJ uses the claimant's RFC to determine the claimant's ability to engage in various levels of work (e.g., sedentary, light, medium, heavy, or very heavy). *Clifford*, 227 F.3d at 873 n.7 (citing 20 C.F.R. § 404.1567). An ALJ's RFC conclusion must be supported by substantial evidence in the record. *Clifford*, 227 F.3d at 873. Moreover, for meaningful review, the reviewing court "must be able to trace the ALJ's path of reasoning." *Clifford*, 227 F.3d at 874 (citing *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) (noting that an ALJ's explanation must take into account significant evidence that would support the opposite conclusion so that a reviewing court has some idea why the judge rejected it)). Furthermore, an ALJ's decision to deny DIB to a plaintiff "must be based on consideration of all relevant evidence and the reasons for [the ALJ's] conclusion must be stated in a manner sufficient to permit an informed review." *Parris v. Barnhart*, 2004 WL 3008744, *7 (N.D.Ill., 2004) (citing *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988)).

In this case, the ALJ determined that Plaintiff has the RFC to do slightly reduced light work. (R. 18.) According to the ALJ,

32

when he made his finding, he "considered all [Plaintiff's] symptoms and the extent to which these symptoms [could] reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. § 404.1529 and SSRs 96-4p and 96-7p." *Id.* Additionally, he noted that he "considered opinion evidence in accordance with the requirements of 20 C.F. R. § 404.1527 and SSRs 96-2p, 96-5 and 96-6p." *Id.* He then concluded that Plaintiff could: lift and/or carry twenty pounds occasionally, ten pounds frequently; stand and/or walk at least six hours in an eight-hour work day; and sit for at least six hours in an eight-hour workday. *Id.* The ALJ also noted that Plaintiff's RFC is limited; Plaintiff should avoid: heights; dangerous machinery; climbing; and extensive crouching, crawling, and stooping. *Id.* After stating how he arrived at his RFC determination, the ALJ noted the reasons for his determination. Among his reasons were: he stopped smoking three months ago; he can walk one half of a block; he can ride his bike one block several times a week; he has a concern with Coumadin, claiming it causes him to be confused; he can read the newspaper; he can stand for only five minutes; his back hurts; he lost a lot of cartilage in one knee; and he spends his day watching television. *Id.* The ALJ,

however, failed to fully articulate what opinion evidence he considered.

While the ALJ stated that he gave considerable weight to the opinion of the ME, who gave a slightly reduced RFC, he also noted that the State agency consultants gave a light RFC, with no limitations. (R. at 19.) Although the ALJ found that, "[i]n light of the evidence obtained thereafter, including at the hearing, . . . the ME more accurately assessed the [Plaintiff]'s ability to do physical work-related activities", he failed to sufficiently articulate what evidence he found gave more support to the ME's finding, over that of the State agency consultants. (*Id.*) Simply noting that there is other evidence that made the ME's finding more probable, does not allow the Court to clearly trace the ALJ's path of reasoning. Hence, the Court must remand this issue for the ALJ to further articulate what opinion evidence he relied on in formulating his RFC determination.

The Court finds Plaintiff's additional arguments unpersuasive. Plaintiff claims that he suffers from debilitating fatigue and confusion. However, the only evidence that Plaintiff points to is his own testimony, and in his decision, the ALJ found that Plaintiff's testimony was incredible, noting that Plaintiff "claims he cannot stand for five minutes, yet says he can bike

34

for short distances." (R. at 13.) In addition, the ALJ agreed
with the ME, who found that, despite Plaintiff's claims of
disabling fatigue, he had slightly reduced light residual
functional capacity. While discussing Plaintiff's limitations on
physical exertion, the ME testified that, although Plaintiff
might be able to perform heavier exertions for short periods of
time, he should limit himself to light levels of activity and
should stop smoking. (R. at 153.) The ALJ noted that, despite
alleging disabling fatigue, Plaintiff stopped smoking just three
months prior to the hearing. Additionally, Plaintiff himself did
not characterize his alleged confusion as substantial. When the
ALJ inquired about Plaintiff's memory, he responded, "I get kind
of confused at times. But other than that, I think it's fair."
(R. at 162.) Hence, this Court is satisfied that the ALJ's
finding that Plaintiff does not suffer from debilitating fatigue
and confusion is supported by substantial evidence.

Plaintiff's claim that the RFC of light work suggested by the
ME, and which the ALJ relied on, is erroneous *ab initio* because
the ME did not hear Plaintiff's testimony before he made that
determination, too must fail. While the ME may have not had the
benefit of listening to Plaintiff's subjective complaints at the
hearing before making his determinations, the ALJ did, which he

35

notes he considered in his RFC determination. Additionally,
Plaintiff's complaints regarding the hypothetical question posed
to the VE are also flawed. According to Plaintiff, the
hypothetical did not contain a fully developed vocational profile
of Plaintiff's exertional and nonexertional capacities. However,
Plaintiff fails to make any specific reference to what was
missing from the hypothetical. Morever, Plaintiff received an
opportunity during the hearing to cross-exam the VE and, in fact,
added "stooping" to the hypothetical posed to the VE, who found
that the addition would not impact the numbers of jobs cited.
Hence, the Court does not find that these issues warrant remand.


## CONCLUSION

For the reasons set forth above, the Court finds that
meaningful review is not possible because the ALJ failed to
articulate the basis for his determinations that Plaintiff does
not meet or equal a Listing and that Plaintiff has the RFC to do
slightly reduced light work. On the other hand, however, the ALJ
sufficiently articulated his basis for his determination that
Plaintiff was not credible. Accordingly, the Court must grant
Plaintiff's motion for Summary Judgment in part, and deny the

Commissioner's Motion for Summary Judgment.  This matter is
remanded for further proceedings consistent with this opinion.

Date: April 30, 2008     E N T E R E D:

Arlander Keys

MAGISTRATE JUDGE ARLANDER KEYS
UNITED STATES DISTRICT COURT

37